## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| PORTIA MCCOLLUM, Derivatively on Behalf of Nominal Defendant FIDELITY NATIONAL INFORMATION SERVICES INC., | ) ) ) ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) ) | JURY TRIAL DEMANDED DERIVATIVE ACTION |
| v. | ) ) | |
| GARY A. NORCROSS, STEPHANIE FERRIS, LEE ADREAN, ELLEN R. ALEMANY, MARK BENJAMIN, VIJAY D'SILVA, JEFFREY A. GOLDSTEIN, LISA A. HOOK, KENNETH LAMNECK, GARY L. LAUER, LOUISE M. PARENT, BRIAN T. SHEA, JAMES B. STALLINGS, JR., JEFFREY E. STIEFLER, KEITH W. HUGHES, MARK J. HAWKINS, and MARK A. ERNST | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) ) | |
| and | ) ) ) | |
| FIDELITY NATIONAL INFORMATION SERVICES INC., | ) ) | |
| Nominal Defendant. | | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff Portia McCollum ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal

defendant Fidelity National Information Services Inc. ("Fidelity National" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Fidelity National, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought on behalf of Fidelity National against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least February 9, 2021 and February 10, 2023, inclusive (the "Relevant Period") as set forth below.

2.    Fidelity National is a financial technology company which offers various solutions in three key segments: Merchant Solutions; Banking Solutions; and Capital Market Solutions. The Merchant Solutions segment,

which constituted roughly 30 percent of Fidelity National's total revenue in 2021, enables retailers to accept and process electronic payment transactions.

3.     On July 31, 2019, Fidelity National announced that it had completed the acquisition of Worldpay, Inc. ("Worldpay"), a global payment processing company, for $43 billion. After the acquisition, the Company planned to integrate Worldpay into its Merchant Solutions segment.

4.     Throughout the Relevant Period, certain members of the Company's Board issued false and misleading statements about the Worldpay acquisition, indicating that Fidelity National had "successfully completed the Worldpay integration" and touting the purported benefits of the acquisition for the Company.

5.     In reality, the Company's Merchant Solutions segment was seriously underperforming, and the Company failed to "successfully complete[]" the Worldpay integration as of the end of the Relevant Period.

6.     The truth with respect to the Company's failed integration efforts slowly emerged, beginning on August 4, 2022 with a series of key management changes. Changes in the Company's executive leadership alerted shareholders and the public that perhaps the Worldpay integration had not been progressing as seamlessly as the Individual Defendants had indicated.

7.     On November 3, 2022, the Company announced disappointing

financial results for its Merchant Solutions segment, reporting a "margin contraction of 430 basis points."

8.     Finally, on February 13, 2023, the Company announced that it was getting rid of its Merchant Solutions business and Worldpay. The Company further reported that it had recognized a staggering $17 billion write-off of that asset.

9.     In response to these announcements, the Company's stock price declined dramatically, closing at $66.00 per share on February 13, 2023, down more than 36 percent from the stock's closing price of $104.13 per share on August 3, 2022, just before the Company began reporting its leadership changes.

10.     As a result of the foregoing, a securities class action was filed against the Company and Defendants Gary Norcross and Stephanie Ferris, as well as James Woodall, who is not a party to this action, captioned *Palm Bay Police and Firefighters' Pension Fund v. Fidelity Nat'l Info. Services, Inc.*, Case No. 3:23-cv-00252-TJC-PDB (M.D. Fla.) (the "Securities Action"). The Securities Action has exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Sections 10(b) and 20(a)

of the Exchange Act (15 U.S.C. §§ 78j(b)) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

12.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.    Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as Fidelity National is headquartered in this Judicial District and a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this Judicial District.

## **<ins>PARTIES</ins>**

16.    Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Fidelity National common stock. Plaintiff's verification is attached hereto as Exhibit 1.

17.    Nominal Defendant Fidelity National is a Georgia corporation and maintains its principal executive offices at 601 Riverside Avenue,

Jacksonville, Florida 32202. Fidelity National's common stock is traded on the NYSE under the ticker symbol "FIS."

18.     Defendant Gary A. Norcross ("Norcross") became a member of the Board in 2013, Chief Executive Officer ("CEO") of the Company in 2015 and Chairman of the Board in 2018, and he served in those positions until his departure from Fidelity National in December 2022. Norcross also served as Chief Operating Officer ("COO") of the Company from 2009 to 2015 and as President of the Company from 2012 until March 2021. According to the Company's public filings, Norcross received $45,321,374 in 2022 in compensation from the Company.

19.     Defendant Stephanie Ferris ("Ferris") has served as a member of the Board of the Company since October 2022, as President of the Company since February 2022 and as CEO of the Company since December 2022. Ferris served as Chief Financial Officer ("CFO") of Worldpay until Fidelity National's acquisition of Worldpay in July 2019. According to the Company's public filings, Ferris received $15,830,864 in 2022 in compensation from the Company.

20.     Defendant Jeffrey A. Goldstein ("Goldstein") has served as a member of the Board of the Company since 2020 and as Chairman of the Board since December 2022. Goldstein serves as a member of the Compensation Committee and the Corporate Governance, Nominating and

Sustainability Committee. Goldstein served as a member of the Audit Committee of the Board throughout 2021. According to the Company's public filings, Goldstein received $376,241 in 2022 in compensation from the Company.

21.     Defendant Lee Adrean ("Adrean") has served as a member of the Board of the Company since January 2023 and serves as a member of the Audit Committee. Adrean also served as a member of the Board of the Company from July 2019 until May 2021.

22.     Defendant Ellen R. Alemany ("Alemany") has served as a member of the Board of the Company since 2014 and serves as Chair of the Corporate Governance, Nominating and Sustainability Committee and as a member of the Audit Committee. According to the Company's public filings, Alemany received $394,620 in 2022 in compensation from the Company.

23.     Defendant Mark Benjamin ("Benjamin") has served as member of the Board of the Company since January 2023 and serves as a member of the Compensation Committee.

24.     Defendant Vijay D'Silva ("D'Silva") has served as a member of the Board of the Company since March 2022 and serves as a member of the Corporate Governance, Nominating and Sustainability Committee.

25.    Defendant Kenneth T. Lamneck ("Lamneck") has served as a member of the Board of the Company since March 2022 and serves as a member of the Audit Committee and the Compensation Committee.

26.    Defendant Lisa A. Hook ("Hook") has served as a member of the Board of the Company since 2019 and serves as a member of the Audit Committee. According to the Company's public filings, Hook received $399,991 in 2022 in compensation from the Company.

27.    Defendant Gary L. Lauer ("Lauer") has served as a member of the Board of the Company since 2019 and serves as Chair of the Compensation Committee and as a member of the Corporate Governance, Nominating and Sustainability Committee. According to the Company's public filings, Lauer received $369,158 in 2022 in compensation from the Company.

28.    Defendant Louise M. Parent ("Parent") has served as a member of the Board of the Company since 2017 and serves as a member of the Audit Committee and the Corporate Governance, Nominating and Sustainability Committee. According to the Company's public filings, Parent received $391,287 in 2022 in compensation from the Company.

29.    Defendant Brian T. Shea ("Shea") has served as a member of the Board of the Company since 2018 and serves as Chair of the Audit

Committee. According to the Company's public filings, Shea received $382,648 in 2022 in compensation from the Company.

30. Defendant James B. Stallings, Jr. ("Stallings") has served as a member of the Board of the Company since 2013 and serves as a member of the Compensation Committee. According to the Company's public filings, Stallings received $361,659 in 2022 in compensation from the Company.

31. Defendant Jeffrey E. Stiefler ("Stiefler") has served as a member of the Board since 2019 and serves as a member of the Compensation Committee and the Corporate Governance, Nominating and Sustainability Committee. According to the Company's public filings, Stiefler received $424,212 in 2022 in compensation from the Company.

32. Defendant Keith W. Hughes ("Hughes") served as a member of the Board of the Company from 2002 until January 2023. According to the Company's public filings, Hughes received $377,734 in 2022 in compensation from the Company.

33. Defendant Mark J. Hawkins ("Hawkins") served as a member of the Board of the Company from June 2021 until his resignation in August 2021 due to a conflict of interest in connection with his membership on the Board of Directors of another company.

34. Defendant Mark A. Ernst ("Ernst") served as a member of the Board of the Company from December 2022 until his resignation in January

2023 due to a preexisting non-competition agreement between him and his former employer.

35.     The defendants identified in ¶¶ 18-34 above are collectively referred to herein as the "Individual Defendants."

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

36.     By reason of their positions as officers and/or directors of Fidelity National, and because of their ability to control the business and corporate affairs of Fidelity National, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fidelity National in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fidelity National and its shareholders.

37.     Each director and officer of the Company owes to Fidelity National and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fidelity National, were able to and did, directly and/or indirectly, exercise control over the wrongful acts

complained of herein.

39.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Fidelity National, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause

the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

41.    To discharge their duties, the officers and directors of Fidelity National were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Fidelity National were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Georgia and the United States, and pursuant to Fidelity National's own Code of Conduct and Business Ethics;

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Fidelity National conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)   Establish and maintain systematic and accurate records and reports of the business and internal affairs of Fidelity National and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)   Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fidelity National's operations would comply with all applicable laws and Fidelity National's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)   Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(vii)   Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Fidelity National and were at all times acting

within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

45.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

46.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors or officers of

Fidelity National, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

48.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fidelity National and at all times acted within the course and scope of such agency.

## FIDELITY NATIONAL'S CODE OF BUSINESS CONDUCT AND ETHICS

49.     Fidelity National's Code of Business Conduct and Ethics (the "Code of Conduct") begins with a message from Defendant Ferris, stating, in relevant part:

> FIS is a global organization with locations and business partners all over the world. Our company was founded on the belief that doing the right thing builds a foundation for our long-term success. As we continue to grow, one thing that will never change

is our belief that maintaining our good reputation depends on each of us being personally responsible for our actions.

Each of us will face tough decisions and ethical dilemmas during our careers. When faced with different choices, it is not always easy to make the ethical decision. While achieving great results is important, it is even more important to focus on how we achieve them. The decisions you make each day have an impact on our core values – **Lead with Integrity, Be the Change** and **Win as One Team**.

At FIS, we are on a relentless pursuit of client excellence to go above and beyond our clients' expectations. As an integral part of this pursuit, ethical business practices and behaviors are a top priority, at the core of everything we do, and woven into our daily operations.

Our behavior impacts the company's reputation with clients and shareholders, dealings with suppliers, communications with regulatory agencies and interactions with others in the workplace. We believe the quality of our people is our greatest asset, differentiating us and personifying our leadership position within the industry. You play a critical role in upholding FIS' reputation for ethical business practices and performance for client excellence.

50.     In a subsection titled "Lead With Integrity," the Code of Conduct states, in relevant part, "We have the courage to be open and transparent—to build trust."

51.     In a section titled "Compliance with Laws," the Code of Conduct states that "Colleagues are **REQUIRED** to comply not only with the Code and Company Policies but also with applicable laws, rules, and regulations in connection with their employment or service with the Company."

52.     With respect to financial reporting, the Code of Conduct states, in

relevant part:

> The Company has established policies and internal controls designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements. Internal controls are intended to ensure the following:
>
> - Full and accurate records of dispositions of Company assets are maintained;
> - Transactions are recorded as necessary to prepare accurate financial statements;
> - Receipts and expenditures are made only in accordance with official authorizations; and
> - Unauthorized acquisition, use or disposition of the Company's assets are prevented or detected.

53.     With respect to public disclosure, the Code of Conduct stated, in

relevant part:

> As a public company, the Company **MUST** provide full, fair, accurate, timely and understandable disclosure in the reports that the Company files with or submits to the SEC and its other public disclosures, including press releases. Such disclosures **MAY** include information generated by or related to the Company's subsidiaries located around the world. The Company has established disclosure controls and procedures to help ensure that information required to be disclosed by the Company in its SEC reports and other public disclosures is accumulated from appropriate information sources within the Company, and communicated to management as appropriate to allow timely decisions regarding disclosure and the completion of accurate SEC reports.
>
> The Company's SEC reports and other public disclosures **MUST** be free of material misstatements and misleading omissions. The Company's public financial information **SHOULD** fairly represent in all material respects the Company's financial condition, results of operations and cash flows.

## FIDELITY NATIONAL'S AUDIT COMMITTEE CHARTER

54.    Fidelity National's Audit Committee Charter states that the purpose of the Audit Committee is to, among other things, "provide independent review and oversight of the Company's accounting and financial reporting processes, financial statements, internal controls over financial reporting, , [*sic*] audit processes and financial results of the Company's operations."

55.    The Audit Committee Charter further states that:

> The Committee is responsible for assisting the Board's oversight of (1) the quality and integrity of the Company's financial statements and related disclosures, (2) the Company's compliance with legal, tax and regulatory requirements, (3) the independent registered public accounting firm's qualifications and independence, and (4) the performance of the Company's internal audit function, internal controls over financial reporting, and independent registered public accounting firm.

56.    In a subsection titled "Financial Statements and Related Disclosures," the Audit Committee Charter states, in relevant part:

> The Committee shall review with management and the independent registered public accounting firm the annual audited financial statements, the quarterly financial statements, and any internal control matters requiring attention, including the Company's disclosures under MD&A, before the filing of the Company's Form 10-K and Form 10-Q.

> The Committee shall review with management earnings press releases before they are issued. The Committee shall review generally with management the nature of the financial information and earnings guidance provided to analysts and rating agencies.

\*\*\*

> The Committee shall review with management, and any outside professionals as the Committee considers appropriate, the effectiveness of the Company's disclosure controls and procedures.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

57.    Fidelity National is a global financial technology Company, founded in 1968 as Systematics, that provides a range of products and services to financial institutions and other businesses.

58.    In 2003, the Company was acquired by Fidelity National Financial and was renamed Fidelity National Information Services.

59.    Over the next several years, in large part due to key acquisitions of other financial technology companies, Fidelity National grew into a Fortune-500 company and the largest processing and payments company in the world.

60.    The Company's key offerings are its Merchant Solutions, Banking Solutions, and Capital Market Solutions. The Merchant Solutions segment, constituting roughly 30% of the Company's total revenue in 2021, enables retailers to accept and process electronic payment transactions.

61.    On July 31, 2019 Fidelity National announced that it had acquired Worldpay, Inc. ("Worldpay"), a global payment processing company, and planned to integrate it into its Merchant Solutions segment.

62.    The Worldpay acquisition was the Company's largest acquisition to date and was valued at $43 billion. Fidelity National touted the acquisition as a catalyst for Company growth. Specifically, in the press release announcing the closing of the acquisition, then-CEO Defendant Norcross stated that "the Worldpay acquisition is a demonstrable proof point in our overall growth strategy. We are confident that our focus on innovating with purpose to advance the way the world pays, banks and invests will continue to deliver long-term value to our clients and shareholders." Fidelity National further called for an "organic revenue growth outlook of 6 percent to 9 percent through 2021, in conjunction with $700 million of total EBITDA synergies from the combination of revenue and expense opportunities over the next three years."

63.    Leading up to the Relevant Period, the Company assured shareholders and the public that the Worldpay integration was progressing smoothly. For example, during a February 2020 earnings call, while discussing the Company's priorities for the upcoming year, Defendant Norcross stated: "We will seamlessly execute the Worldpay integration in order to achieve our revenue and cost synergy goals. *We are already well-*

***ahead of schedule*** and will look to further accelerate our momentum in 2020" (emphasis added).

### *Defendants' Materially False and Misleading Statements*

64.     The Relevant Period begins on February 9, 2021, when the Company held an earnings call after announcing its fourth quarter and full year 2020 financial results. During the call, then-CEO Defendant Norcross overstated the Company's progress with the Worldpay integration, stating:

> [Fidelity National] made great progress with the Worldpay integration, remaining well ahead of plan and exited the year generating more than $200 million in revenue synergies and more than $750 million in cost synergies. With this impressive momentum, we are excited to build on our strengths as we look ahead to accelerating organic revenue growth in 2021.

65.     On February 18, 2021, Fidelity National filed an annual report on Form 10-K with the SEC (the "February 18, 2021 10-K"). With respect to the Worldpay integration, that filing, signed by Individual Defendants Norcross, Adrean, Alemany, Goldstein, Hook, Hughes, Lauer, Parent, Shea, Stallings, and Stiefler, stated:

> As of the end of 2020, our achievement of revenue synergies remains on track to meet or exceed our current targets driven by successful cross-sell of our heritage Premium Payback solution into heritage Worldpay clients and by leveraging our heritage Worldpay sales and distribution teams, expanding on our existing relationships with financial institutions to establish merchant referral agreements and optimizing our network routing capabilities.

66.    On March 22, 2021, at the Bank of America Securities Electronic Payment Virtual Symposium, Defendant Norcross highlighted the benefits to the Company of having completed the Worldpay integration, stating, "our cross-sell wins have been very strong coming out of the Worldpay integration . . . the fundamentals of putting the 2 companies together really has exceeded our expectations at this point. We're well ahead of process." At that same conference, Norcross further claimed that after having incorporated Worldpay, the Company's Merchant Solutions segment "long term could be a double[-]digit grower," despite the fact that Worldpay had historically experienced only single-digit revenue growth.

67.    On May 6, 2021, during the Company's first quarter 2021 earnings call, Defendant Norcross indicated that "synergies with the Worldpay integration" had made a "significant contribution" to Fidelity National's increased financial guidance.

68.    On August 3, 2021, during the Company's second quarter 2021 earnings call, Defendant Norcross told analysts that "you're seeing us exceed our cross-sales and revenue synergies with the Worldpay integration." Defendant Norcross further partially attributed the Company's "record quarter from a sales perspective" to "revenue synergies across the Worldpay integration efforts."

69.     On November 4, 2021, during the Company's third quarter 2021 earnings call, Defendant Norcross stated:

> Revenue synergies related to our Worldpay integration increased to $150 million in the quarter, bringing the total to $600 million on an annual run rate basis. We remain on schedule to exceed $700 million exiting this year, beating our original target by 40%, while accomplishing this feat a year early.

70.     On November 16, 2021, at the RBC Global Technology, Internet, Media and Telecom Conference, Defendant Norcross indicated that the Company had successfully completed the Worldpay integration, stating: "when you look at where we are on the Worldpay integration, we've got really Worldpay predominantly behind us now. We've got all our segments really hitting on all cylinders[.]"

71.     On February 15, 2022, during Fidelity National's earnings call for the fourth quarter and full year 2021, Defendant Norcross announced that the Company had "successfully completed the Worldpay integration nearly a year ahead of schedule, beating our initial revenue synergy target by 50% and more than doubling our initial expense synergy target." Norcross further highlighted that the Company's sales team "has done an excellent job driving cross sales through the Worldpay integration." Norcross reiterated that Fidelity National would be able to "take advantage of a broader addressable market" as a result of "success in revenue synergies with the Worldpay integration."

72.     On February 23, 2022, Fidelity National filed an annual report on Form 10-K with the SEC. The filing was signed by Individual Defendants Norcross, Alemany, Goldstein, Hook, Hughes, Lauer, Parent, Shea, Stallings, and Stiefler and contained substantively the same statement with respect to the Worldpay integration that was contained in the February 18, 2021 10-K.

73.     On March 9, 2022 at Wolfe Research's Fintech Forum, Defendant Norcross stated:

> [Fidelity National] really successfully completed the Worldpay integration. We blew out any of our operating synergies going into that, whether it was on expense takeout or revenue. Revenue exceeded well over $700 million across sales. We ended up getting over $900 million of cost takeout. So we feel great about that integration and how that went.

74.     The statements referenced in paragraphs 64 through 73 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (1) the Worldpay integration was not ahead of schedule; (2) the Company failed to successfully integrate Worldpay throughout the Relevant Period; (3) the increases in revenue synergies were not related to the Worldpay integration; and (4) as a result, Defendants materially overstated the Company's financial guidance, business, operations, and prospects.

***The Truth Emerges***

75.     Despite Defendants' repeated indications that the Worldpay integration was "successfully completed," the truth with respect to the Company's hardships began to slowly emerge when Fidelity National announced the departures of its CEO and CFO.

76.     On August 4, 2022, the Company filed a Current Report on Form 8-K with the SEC announcing Fidelity National's second quarter 2022 financial results. That filing announced the resignation of James Woodall ("Woodall"), Fidelity National's Corporate Executive Vice President and CFO. Woodall would be replaced by Eric Hoag ("Hoag") effective November 4, 2022.

77.     On this news, the Company's stock price declined $7.56 per share, or more than 7 percent, closing at $96.57 per share on August 4, 2022. Despite the executive turnover, during the Company's second quarter 2022 earnings call on the same day, then-President, Defendant Ferris, maintained that Fidelity National has been "hugely successful in terms of driving revenue synergies on the Worldpay transaction."

78.     The Company continued to undergo management changes. On October 18, 2022, Fidelity National issued a press release announcing that Defendant Ferris, who had been appointed President in February 2022, would replace Defendant Norcross as the new CEO effective January 1, 2023. Defendant Norcross, who had served as CEO since 2015, would become Executive Chairman of the Board.

79. The Company's carefully crafted narrative with respect to the Worldpay integration unraveled further on November 3, 2022, when Fidelity National announced disappointing financial results during its third quarter 2022 earnings call (the "November 3, 2022 earnings call"), specifically highlighting the Company's struggling Merchant Solutions segment. During that call, Defendant Norcross reported that profit margins in the Merchant Solutions segment "saw a continued pressure in the quarter," which "resulted in an overall adjusted EBITDA margin contracting by 150 basis points year-on-year." Norcross explained, "we are not pleased with the profitability performance of the business and are taking actions to address them." Further, on the same call, the Company's new CFO, Eric Hoag, specifically highlighted the 430 basis-point margin contraction in the Merchant Solutions segment during the quarter. Despite the evident problems with the Merchant Solutions segment, in response to a question about the Company's other cross-selling projects, Norcross stated that Fidelity National has been "simply taking the success that we had with the Worldpay integration of cross-sales and amplifying that up to the next level."

80. During that same earnings call, David Koning, a Baird analyst, encapsulated the Company's disappointing financial results, bluntly stating: "on margins . . . if we look first just at Merchant, it was close to 100%

incremental margin in both 2020 and 2021. And now this year it's closer to zero."

81.   After the November 3, 2022 earnings call, analysts from Raymond James reported "a disastrous 3Q print that we can only hope was the kitchen sink and then some." Raymond James analysts further stated that they were "particularly disappointed by merchant growth." Analysts at UBS reported that Fidelity National's "results missed our and Street expectations driven by underperformance from Merchant Solutions," noting that "[w]hile we were expecting some form of medium-term guidance reset, we were still anticipating to hear about a path back to high-single digits for Merchant Solutions, which did not occur, leading some investors to wonder if there may be structural problems."

82.   On this news, the Company's stock price declined $22.29 per share, or more than 28 percent, closing at $57.18 per share on November 3, 2022.

83.   On December 15, 2022, the Company announced that it was conducting a "comprehensive assessment of the Company's strategy, business, operations and structure" with a "focus on identifying and optimizing incremental revenue generation, margin improvement and cost reduction opportunities." The Company further reported that then-CEO, Defendant Norcross, would be stepping down as CEO and as a Board member

earlier than anticipated. Norcross would resign as CEO effective December 16, 2022, rather than the previously announced date of January 1, 2023, and he would no longer be appointed Executive Chairman of the Board as the Company had indicated earlier.

84.     The truth finally fully emerged on February 13, 2021, when the Company filed a Current Report on Form 8-K with the SEC, announcing its fourth quarter and full year 2022 financial results. That filing included a press release announcing that the Company would be getting rid of its Merchant Solutions business and Worldpay and "recorded a non-cash goodwill impairment charge of $17.6 billion related to Merchant Solutions reporting unit in the quarter." This staggering write-off constituted more than 40 percent of the Company's acquisition price for Worldpay just a few years earlier.

85.     In the wake of this news, analysts from Mizuho characterized the Worldpay acquisition as "a huge failure," stating that the Company's merchant business has "deteriorated considerably since the merger." Additionally, analysts from Morningstar attributed the massive write-off to the Company's poor execution of the Worldpay integration, explaining that "recent issues stem more form operational missteps and that the strategy behind the combination was not necessarily flawed from a long-term perspective." Wells Fargo issued a report titled "FIS: The Struggle is Real,"

which further highlighted the enormous, $17.6 billion impairment charge. Argus Research reported that "the unwinding of the large Worldpay acquisition is a black eye on the company's former strategy."

86.    On this news, the price of Fidelity National stock declined another $9.43 per share, or more than 12%, from its price on the prior trading day of February 10, 2023, closing at $66.00 per share on February 13, 2023.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

88.    Fidelity National is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

89.    Plaintiff is a current shareholder of Fidelity National and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

90.    At the time this action was commenced, the thirteen-member

Board was comprised of Defendants Adrean, Alemany, Benjamin, D'Silva, Ferris, Goldstein, Hook, Lamneck, Lauer, Parent, Shea, Stallings, and Stiefler. Accordingly, Plaintiff is only required to show that seven Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

91.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the issuance of various false and misleading statements, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

92.     The Individual Defendants either knowingly or recklessly issued

or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

93.     As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Fidelity National, the Individual Defendants knew, or should have known, the material facts surrounding the Worldpay integration.

94.     Moreover, the Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

95.     Defendants Shea, Adrean, Alemany, Hook, Lamneck, Parent, and Goldstein are not disinterested or independent, and therefore, are incapable of considering a demand because they serve or have served as members of the Audit Committee during the Relevant Period and, pursuant to the Audit

Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Worldpay integration. Therefore, Defendants Shea, Adrean, Alemany, Hook, Lamneck, Parent, and Goldstein cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

96.    The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Fidelity National's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

97.     Further, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

98.     The Individual Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct.  Thus, any demand on the current Board would be futile.

99.     Significantly, none of the Individual Defendants have taken remedial action to redress the conduct alleged herein. For instance, none of the Company's current directors have sought to enforce Fidelity National's Clawback Policy, which provides:

> [The Board may] recover cash and equity incentive-based compensation from our executive officers if we are required to prepare an accounting restatement due to material noncompliance with financial reporting requirements, including an act of fraud or willful misconduct that caused the need for an accounting restatement, and the incentive-based compensation paid during the preceding three-year period would have been lower had the compensation been based on the restated financial results. In addition to this policy, our annual incentive plan gives our Compensation Committee complete discretion to reduce or eliminate annual incentives that have not yet been paid.

100.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business

judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of fiduciary duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

101.   The acts complained of herein constitute violations of fiduciary duties owed by Fidelity National's officers and directors, and these acts are incapable of ratification.

102.   The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Fidelity National. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Fidelity

National, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

103.   If there is no directors' and officers' liability insurance, then the directors will not cause Fidelity National to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

104.   Thus, for all of the reasons set forth above, all of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

105.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

106.   The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

107.   The Individual Defendants, individually and in concert, directly

or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.   The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

109.   The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Fidelity National were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

110. The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Fidelity National, their control over,

and/or receipt and/or modification of Fidelity National's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Fidelity National, participated in the fraudulent scheme alleged herein.

111.   As a result of the foregoing, the market price of Fidelity National common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of Fidelity National common stock in purchasing Fidelity National common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

112.   In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

113.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

114.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

115.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

116.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

117.   As a direct and proximate result of the Individual Defendants'

failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

118. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

119. Plaintiff, on behalf of Fidelity National, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

120. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

121. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their

breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the *ultra vires* and illegal conduct complained of herein.

122.   Plaintiff, on behalf of Fidelity National, has no adequate remedy at law.

## **COUNT IV**

### **Against the Individual Defendants for Waste of Corporate Assets**

123.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

124.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

125.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Action.

126.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

127. Plaintiff, on behalf Fidelity National, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Fidelity National and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the Company damages in an amount to be determined at trial as a result of the Individual Defendants' violation of securities law, breaches of fiduciary duties and waste of corporate assets;

C.      Directing Fidelity National to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Fidelity National and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Board's internal operational control functions;

D.     Awarding to Fidelity National restitution from the Individual

Defendants;

E.     Awarding to Plaintiff the costs and disbursements of the action,

including reasonable attorneys' fees, accountants' and experts' fees, costs, and

expenses; and

F.     Granting such other and further relief as this Court may deem

just and proper.

## <u>JURY DEMAND</u>

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  April 27, 2023                **LOCAL COUNSEL:**

 /s/ William J. Cook
William J. Cook, Esquire
Florida Bar No. 986194
Cook Law, P.A.
610 East Zack Street,
Suite 505
Tampa, Florida 33602
Telephone:  813/489-1001
wcook@cooklawfla.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert Mondros (#3308)
300 Delaware Avenue, Suite
210
Wilmington, DE 19801
(302) 295-5310

*Attorneys for Plaintiff*